AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: Jason Harley 5/29/24

# UNITED STATES DISTRICT COURT
### for the
### Western District of Oklahoma

amg
5/29/24

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Premises known as 11728 SW 3rd St., Yukon, Oklahoma 73099, the surrounding curtilage, and any vehicles, garages, and outbuildings thereon

)
)
)
)
)
)

Case No. M-24 471 -AMG

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Western _____ District of _____ Oklahoma _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C § 846 | Drug Conspiracy |
| 21 U.S.C. § 841(a) | Possession with Intent to Distribute and Distribution of Controlled Substances |

The application is based on these facts:

See attached Affidavit of FBI SA Marc Jones

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Marc Jones, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/29/24

City and state: Oklahoma City, Oklahoma

*Judge's signature*

Amanda Maxfield Green, U.S. Magistrate Judge
*Printed name and title*

## WESTERN DISTRICT OF OKLAHOMA
## OKLAHOMA CITY, OKLAHOMA

STATE OF OKLAHOMA    )
                           )
COUNTY OF OKLAHOMA )

### AFFIDAVIT

I, Marc Jones, Special Agent with the Federal Bureau of Investigation (FBI), having been duly sworn, depose and state as follows:

1.      I have been a Special Agent with the FBI since April 2021. I am currently assigned to the Oklahoma City Division, where I am assigned to the Criminal Enterprise Squad, which is responsible for investigating street gang and drug-related offenses. Since becoming a Special Agent, I have been trained in a variety of investigative matters which involved the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846.

2.      Prior to joining the FBI, I was a Child Protective Services Specialist from October 2015 to March 2021. In that capacity, I investigated allegations of child abuse and/or neglect and reported the findings of my investigations to the District Attorney's Office. Through my training and experience, I have become familiar with the methods and operation of drug distributors, including their common organizational structures, use of violence, methods of distributing, storing, and transporting drugs, and methods of collecting and laundering drug proceeds. As part of my investigative experience as an FBI Special Agent, I have

1

been the affiant in multiple Title III wire intercept affidavits, executed search and arrest warrants, conducted physical surveillance, coordinated controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.

3.     The facts set forth below are based upon my own personal observations, reports and information provided to me, the Oklahoma City Police Department (OCPD), or the FBI by other law enforcement agents, and other documents obtained during the course of this investigation.   All of the below-described dates, times, and drug and currency amounts are approximate.

4.     The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure search warrant for 11728 SW 3rd St., Yukon, Oklahoma 73099 (the **SUBJECT RESIDENCE**), as described further in **Attachment A** (physical description), to include the surrounding curtilage and any vehicles, garages, or outbuildings located thereon, for evidence of violations of 21 U.S.C. § 841(a)(1) (manufacturing, possessing, distributing and selling of controlled substances) and 21 U.S.C. § 846 (drug conspiracy), as described further in **Attachment B** (description of items to be seized).   Since this Affidavit is being submitted for the limited purpose of securing

2

a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants.

## BACKGROUND REGARDING DRUG CASES

5.     As discussed previously, based on my training, experience, and consultation with other seasoned drug investigators, I am familiar with the *modus operandi* of drug traffickers. Based on my training and experience, as well as my participation in numerous drug-related investigations, I know the following:

a)     I am aware that drug dealers frequently keep assets, records, and documents related to their drug distribution organizations, and monies derived from the sale of illegal drugs, in their own residences, as well as in safe houses where they are not easily detectable by law enforcement officials conducting investigations. Further, I am aware that these individuals will frequently maintain these houses in the name of other individuals, also to avoid detection by law enforcement agencies;

b)     I am aware that even though relevant assets, telephones, and properties are often held in alias or third-party names, drug dealers continue to use and exercise dominion and control over them;

c)     I am aware that drug dealers often maintain on-hand quantities of currency and drugs in order to finance their ongoing drug business;

d)     I am aware that drug dealers maintain books, records, receipts, notes,

3

ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances, even though such documents may be in code.  It is particularly common that individuals engaged in drug trafficking will keep ledgers related to their illegal activity because drug dealers commonly "front" drugs (provide controlled substances on consignment) to their clients, and are frequently "fronted" drugs by their own sources of supply as part of their dealing operations;

e)      I am aware that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug dealers have ready access to them, i.e., homes, automobiles businesses and safe houses, and that the most common place for these items to be located is at their primary residence;

f)      I am aware that drug dealers will frequently keep records, notes, ledgers, contact lists, and other evidence of their drug trafficking on cellular phones, and that they often keep such cellular phones on their person or in the properties that they control.  Further, I am aware that drug dealers will often have multiple cellular phones, and will frequently use more than one cellular phone to help conduct their drug trafficking.  I am also aware that drug dealers will use computers and tablets to further their drug trafficking through the use of digital communication, including, but not

limited to, e-mail and instant messaging;

g)     I am aware that it is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions, drug sources and drug customers, in secure locations within residences, garages, storage building, safes, and safety deposit boxes for ready access, and also to conceal such items from law enforcement agencies;

h)     I am aware that when drug dealers acquire large sums of proceeds from the sale of drugs, they attempt to legitimize their profits;

i)     I am aware that to accomplish these goals, drug dealers utilize, among other things, banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, shell corporations, and business fronts;

j)     I am aware that drug dealers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the drug dealers organization, even if said items may be in code;

k)     I am aware that drug dealers commonly take photographs (or cause photographs to be taken) of themselves, their associates, their property and their products, and that these dealers usually maintain these photographs in their possession and at their residence; and

l)     I am aware that firearms are commonly used by drug dealers to

protect their inventory and currency.

## **PROBABLE CAUSE**

6.      In October of 2022, Special Agents and Task Force Officers (TFOs) assigned to the FBI initiated a joint investigation targeting Carlos Villanueva (VILLANUEVA) —whom law enforcement believed to be part of a drug trafficking organization (DTO) that distributed cocaine in the Oklahoma City area.  After multiple controlled drug buys and the execution of search warrants, VILLANUEVA was arrested by the FBI in November of 2023.   During May 2023, ~~2023~~ 2024 *cmc* VILLANUEVA and his codefendant, Destin O'Neil Miller (MILLER), both pled guilty in case CR-23-480-R.

7.      During the VILLANUEVA investigation, agents learned that Luis Hernandez Dominguez (DOMINGUEZ) was an associate of VILLANUEVA and also a potential drug-trafficker.  Since law enforcement had a pole camera on VILLANUEVA's residence, they routinely observed DOMINGUEZ arrive at VILLANUEVA's house for what appeared to be drug pickups.[1] The two rarely spent much time together because DOMINGUEZ would arrive, enter VILLANUEVA's residence empty-handed or with an empty bag, stay just a few minutes, and then depart the residence usually carrying a box or full bag.

---

[1]      In November of 2023, a search of VILLANUEVA's residence resulted in the seizure of approximately 10 kilograms of cocaine, two firearms, and approximately $24,000 in U.S. currency.

8.     For example, on June 5, 2023, DOMINGUEZ arrived at VILLANUEVA's residence at approximately 8:24 p.m. and he entered the residence carrying a flattened, likely empty, backpack.  At approximately 8:29 p.m., DOMINGUEZ exited the residence carrying the same backpack, but it was much fuller that it was when he entered.  Events like this were fairly common.

9.     Sometimes, DOMINGUEZ went to VILLANUEVA's house while he was away.  He would arrive at the house driving his personal vehicle, but sometimes his OG&E work truck, enter through the garage, and quickly depart the residence carrying a bag or box.  If he was driving the OG&E truck, he would put the package into the toolbox and then lock it before departing VILLANUEVA's residence.[2]

10.    As noted above, MILLER pled guilty along with VILLANUEVA as a result of this investigation.  MILLER's arrest stemmed from a transaction nearly identical to the multiple DOMINGUEZ's visits to VILLANUEVA's house. On October 30, 2023, MILLER showed up at VILLANUEVA's house, exited his car empty-handed, went into the residence through the garage, and then exited the house carrying a bag.  Once MILLER put the bag into the car, he left VILLANUEVA's residence. Unlike DOMINGUEZ, the agents were not aware of MILLER or his role at the time this transaction occurred, so he was pulled over

---

[2]     Investigators have contacted OG&E and confirmed that DOMINGUEZ was never at VILLANUEVA's house in performance of his job at OG&E.

on a traffic stop not long after departing VILLANUEVA's residence. During a subsequent search of MILLER's car, law enforcement recovered a kilogram of cocaine from the bag that MILLER just took from VILLANUEVA's house.

11.    I have highlighted that historical information about VILLANUEVA in this Affidavit because DOMINGUEZ, who lives at the **SUBJECT RESIDENCE**, has embraced the business model of his former boss, VILLANUEVA. [3]    VILLANUEVA was arrested during November 2023. Following his arrest, the DTO VILLANUEVA worked for was not as active in Oklahoma City as they were throughout much of late 2022 through 2023. During April of 2024, it started to become apparent that DOMINGUEZ had clearly ascended to the position within the DTO that VILLANUEVA previously held. For the reasons outlined below, I submit there is probable cause to believe that DOMINGUEZ, like his former boss, also stores kilogram quantities of cocaine at his residence (**SUBJECT RESIDENCE**).

12.    During early 2024, law enforcement attempted to coordinate a controlled buy of cocaine from DOMINGUEZ. However, DOMINGUEZ informed

---

[3]    Throughout the VILLANUEVA investigation, law enforcement was able to purchase ounce quantities from the DTO. Generally, when purchasing ounce quantities, the distributor would meet the customer at a prearranged location in Oklahoma City. However, as we observed with DOMINGUEZ and MILLER, for larger, kilogram quantities, people went directly to where the product was primarily stored – VILLANUEVA's house.

a confidential human source (CS1)[4] that he would not sell smaller than half kilogram quantities of cocaine.   It is rare to conduct controlled purchases in these amounts because a kilogram of cocaine because it is so cost prohibitive – usually $25,000 - $30,000 in Oklahoma.   However, DOMINGUEZ informed CS1 that he had someone who worked for him, MARQUEZ, that would break DOMINGUEZ's cocaine down to sell in smaller quantities and DOMINGUEZ would put CS1 in contact with him.[5]

13.    In the first half of April 2024, law enforcement used a confidential human source (CS1) to purchase cocaine from MARQUEZ. CS1 communicated directly with MARQUEZ via telephone, and he/she agreed to meet with MARQUEZ in Oklahoma City to exchange ounce quantities of cocaine (roughly $1,000 per ounce) for an agreed upon price. CS1 met with MARQUEZ at the pre-

---

[4]    CS1 was not promised anything in exchange for his/her cooperation but has received two monetary payments for his/her services, the most recent payment being in December of 2023. Additionally, CS1 has received immigration benefits in exchange for his/her services. Information provided by CS1 has been reliable to the best of my knowledge, and I am unaware of any false information provided by VS1. Information herein attributed to CS1, unless otherwise noted, was obtained by CS1 through his/her personal observations and conversations with targets of this investigation and their associates.

[5]    MARQUEZ has verbally confirmed his business relationship with DOMINGUEZ.   Agents have conducted extensive surveillance, both physical and electronic, on DOMINGUEZ and MARQUEZ and the two do not appear to have any normal interactions or relationship outside of their roles and involvement in this DTO.

9

determined meeting location, which was set by MARQUEZ and located near his residence, and exchanged the money for the cocaine.[6] During this controlled buy, MARQUEZ informed CS1 that the drugs he sold came from DOMINGUEZ.

14.     On May 6, 2024, law enforcement observed what appeared to be a drug transaction between DOMINGUEZ and MARQUEZ, based on my knowledge of their relationship and my training and experience. This transaction was very similar to the types of transactions that took place between VILLANUEVA and DOMINGUEZ prior to VILLANUEVA's arrest.   At approximately 5:01 p.m., agents received data from the judicially authorized GPS tracker on MARQUEZ's Chevrolet Silverado.   That data showed that MARQUEZ arrived near 11728 SW 3rd St., Yukon, Oklahoma – the **SUBJECT RESIDENCE**.   Agents also had a pole camera focused on the **SUBJECT RESIDENCE**, so they verified MARQUEZ's arrival.

15.     When MARQUEZ arrived, DOMINGUEZ was outside the **SUBJECT RESIDENCE**, and he was inside the truck of a man who had just arrived at his house a few minutes prior.   That man was later identified as Hector MALDONADO.   Using the pole camera feed, agents watched MARQUEZ park his truck in the street behind MALDONADO's truck, but MARQUEZ did not get

---

[6]     The substance provided by **MARQUEZ** field tested positive for cocaine. During the controlled buy, CS1 was equipped with an FBI-issued recording device, and the recording is maintained by the FBI.

out of his vehicle. Once MARQUEZ parked, DOMINGUEZ got out of MALDONADO's truck and then went inside of the **SUBJECT RESIDENCE.** Two minutes later, DOMINGUEZ exited the **SUBJECT RESIDENCE** carrying a box in his left hand and then he walked to MARQUEZ's truck.

16. Shortly after, DOMINGUEZ, now empty handed, went back to MALDONADO's truck and MARQUEZ departed the **SUBJECT RESIDENCE.** Following MARQUEZ's departure, DOMINGUEZ and MALDONADO exited MALDONADO's truck and entered the **SUBJECT RESIDENCE** through the garage, similar to how DOMINGUEZ would often enter VILLANUEVA's residence. When the two entered the residence, DOMINGUEZ was carrying a black backpack in his hand while MALDONADO was carrying nothing. When the men exited the **SUBJECT RESIDENCE**, this time DOMINGUEZ had nothing in his hand and MALDONADO had what appeared to be a full bag. MALDONADO went to the passenger side of his vehicle and, while concealed from public view, he emptied the contents into the car. Then, back in open view, he discarded the empty bag, got into his car, and departed the **SUBJECT RESIDENCE.**

17. Based on my training and experience and knowledge of their roles in the DTO, I believe that on May 6, 2024, MARQUEZ traveled to DOMINGUEZ's residence to obtain more cocaine. DOMINGUEZ then engaged in a separate transaction with MALDONADO. I believe MALDONADO provided

11

DOMINGUEZ with money in the black backpack. The two men went into the **SUBJECT RESIDENCE**, likely to count the money and gather the cocaine that would be exchanged. When they exited the **SUBJECT RESIDENCE**, MALDONADO had the cocaine and DOMINGUEZ had left the cash proceeds inside the **SUBJECT RESIDENCE**.

18.     On May 27, 2024, there was another similar pickup between MARQUEZ and DOMINGUEZ.  At approximately 8:39 p.m., the GPS tracker data on MARQUEZ's truck showed that he had just arrived at the **SUBJECT RESIDENCE**, and the pole cameras confirmed this.   At approximately 8:40 p.m., DOMINGUEZ exited the **SUBJECT RESIDENCE** carrying a black bag and he took that bag to where MARQUEZ was parked outside the house.   Just 40 seconds later, DOMINGUEZ went back inside the **SUBJECT RESIDENCE**, and he was not carrying the black bag.   MARQUEZ immediately left the area and the GPS tracker data showed that he headed east towards his residence where he ultimately arrived at 9:09 p.m.

19.     Based on my training and experience and knowledge of their roles in the DTO, I believe that on May 27, 2024, three weeks after his last trip to the **SUBJECT RESIDENCE**, MARQUEZ returned for a resupply of cocaine. MARQUEZ arrived at the **SUBJECT RESIDENCE** where DOMINGUEZ provided him with a quantity of cocaine, concealed in a black bag, which MARQUEZ brought back to his residence as he had done before.

20.    Based on my training and experience and the events during this investigation, as put forth in this Affidavit, I believe that DOMINGUEZ is a part of a drug trafficking organization and is involved in the distribution of cocaine within the Western District of Oklahoma. Moreover, based on my training and experience as well as the events outlined in this Affidavit, I believe that DOMINGUEZ is storing the cocaine and the fruits and instrumentalities from his cocaine distribution at the **SUBJECT RESIDENCE**.

## CONCLUSION

21.    Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence relating to violations of 21 U.S.C. §§ 841(a) and 846 will be found at the **SUBJECT RESIDENCE**.   I therefore respectfully request issuance of a search warrant for the **SUBJECT RESIDENCE** (as set forth in **Attachment A**) based on the above-mentioned facts.

**FURTHER, YOUR AFFIANT SAYETH NOT.**

MARC JONES
SPECIAL AGENT
Federal Bureau of Investigation

Sworn to and subscribed before me this 29th day of May, 2024.

AMANDA MAXFIELD GREEN
United States Magistrate Judge

13

## Attachment A

## PROPERTY TO BE SEARCHED

11728 SW 3rd Street, Yukon, Oklahoma 73099
**(Subject Residence)**



11728 SW 3rd Street, Yukon, Oklahoma, is a single-family residence constructed with light brown brick and white siding above a white garage door. There is a walkway leading from the two car driveway to the front door. There are two large windows on the front side of the property facing the street. The residence also has also a two car garage.

## Attachment B

## ITEMS TO BE SEIZED

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a) and 846, which seizure is limited to those individuals reasonably related to or directly involved in said violations, namely:

1.  Items used in the illegal distribution of controlled substances, including, but not limited to, scales, food supplements used for diluting illegal drugs, baggies, spoons, mirrors, straws or other utensils used in the packaging or use of illegal drugs. Also, items typically associated with illegal drug distribution, including firearms, ammunition, silencers, and receivers.

2.  Documents, records, or materials related to the distribution of illegal drugs, including, but not limited to: ledgers, address books, telephone books, telephone bills, telephone records, rent receipts, rental car agreements, mini-storage receipts and keys, cellular telephone agreements, bills and receipts related to cellular telephones, and any property and/or U.S. currency being proceeds of or related to the distribution of illegal drugs. Also ledgers containing quantity of drugs possessed, ledgers of money owed to the suspects for drugs they have provided to co-conspirators, ledgers of money owed by the suspects to their suppliers, transportation and distribution instructions for the drugs being sold, and other types of documentation regarding the sale of drugs.

3.   Financial documents evidencing the illegal distribution of controlled substances, including, but not limited to: bank statements, bank deposit slips, canceled checks, money orders, money order receipts, wire transfer receipts, stored value cards, handwritten notes depicting monies owed for illegal controlled substances, documents showing purported income, and any other evidence showing monetary records of the illegal distribution of controlled substances.

4.   Documents, records, or materials related to the laundering of drug money, including, but not limited to: wire transfer receipts, bank deposit slips, bank withdraw slips, money order receipts, records detailing the purchase of property, items which show control of real property placed in nominee names such as utility payment records, property tax payment records, key to real property, receipts from payment of insurance premiums paid on residences/vehicle.

5.   The fruits and proceeds of the illegal distribution of controlled substances, including, but not limited to: large amounts of currency, financial instruments and other items of value showing the spending of large sums of money made from engaging in the illegal distribution of controlled substances, or other illegal activities.

6.   Any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized, and forensic copies thereof.

2

a.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

7.  Items which tend to show dominion and control of the property searched, including, but not limited to, utility bills, telephone bills, correspondence, rental agreements, property tax payment records, receipt from the payment of insurance premiums on the residence, photographs, and other identification documents.